UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,

       v.

                                        12Cr.585(KBF)

IOANNIS VIGLAKIS,
        a/k/a "Pablo,"

                       Defendant.
-------------------------------------------------------------X

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT IOANNIS VIGLAKIS'S PRE-TRIAL
MOTIONS

**Justin Levine, Esq.**
191 E. 161st Street
Bronx, NY 10451
(718) 992-9600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,

         v.

IOANNIS VIGLAKIS,
        a/k/a "Pablo,"

               Defendant.
-------------------------------------------------------------X

MEMORANDUM OF LAW
IN SUPPORT OF  DEFENDANT
IOANNIS VIGLAKI'S
PRE-TRIAL MOTIONS

12Cr.585(KBF)

## PRELIMINARY STATEMENT

Defendant Ioannis Viglakis submits this Memorandum of Law pursuant to Rule 12(b), Fed.R.Crim.P., in support of his pre-trial motions for: (1) dismissal of the indictment due to a violation of defendant's Fifth Amendment right to due process of law; (2) dismissal of Count Two and Three as to the statute does not allow for extraterritorial jurisdiction; (3) dismissal of Count Three because the defendant's activity does not fall within the statutory jurisdiction of 18 USC §924(c); there is no jurisdiction over a defendant who did not conspire with someone who committed the substantive violation of the statue, and because the alleged conduct is excluded from prosecution;  (4) an order directing the government to provide advance notice of 404(b) material; (5) an order directing the government to provide all information that is material and favorable to the defendant pursuant to _Kyles v. Whitley_, 115 S.Ct. 1555 (1995), _Brady v. Maryland_, 373 U.S. 73 (1963), _Giglio v. United States_, 405 U.S. 150 (1972), _United States v. Bagley_, 473 U.S. 667 (1987) and their progeny; and (6) such other and further relief this Honorable Court may deem just and proper.

### The Indictment

The outlined indictment was original filed on August 2, 2012.  On February 19, 2013, a Three Count superseding indictment was filed and it is hereinafter referred to as the "indictment". A copy of the superseder is attached to Notice of Pre-Trial Motions as Exhibit "A." The first count of the indictment charges the defendant with attempt to commit narco-terrorism alleging that the defendant participated in a scheme to provide weapons to Fuerzas Armadas Revolucionaras de Colombia, South America, (hereinafter "FARC") in exchange for cocaine and cash from November 2011 until or about August 2012.  Such weapons would be used, inter alia, to attack "American forces in Colombia" in violation of 18 U.S.C. §§2339B(a)(1), and 3238. The charges are essentially based on alleged several phone conversations and meetings that Ioannis Viglakis allegedly had with United States Drug Enforcement Agency (hereinafter "DEA") confidential paid sources ("CS-1") (hereinafter "undercover operatives"), in Europe and Central America to negotiate a weapons transaction.  It is further alleged in the indictment that during the course of the negotiations, the defendant Ioannis Viglakis and CS-1 participated in meetings, telephone conversations and emails.

Count Two alleges that Ioannis Viglakis conspired with others to provide weapons and other material support and resources to a foreign terrorist organization (FARC) and to arrange for the delivery of three rocket-propelled grenade launchers and six rocket-propelled grenades through a law enforcement officer acting in an undercover capacity in or around Athens, Greece, in violation of 18 USC §§2339B(a)(1)(d)(1), 3238, and 2.

Count Three alleges that Ioannis Viglakis possessed and used a firearm while conspiring with others to arrange for the delivery of a destructive device to a law enforcement agent acting in an undercover capacity in or around Athens, Greece, in furtherance of the attempt to provide

material support to the FARC as charged in Count One, in violation of 18 USC §§924(c)(1)(A),

(B)(ii), 3238, and 2.

## FACTUAL BACKGROUND

From at least February 2011, the United States Government has pursued and sought to apprehend the defendant Ioannis Viglakis, a Greek national, for what the Government believed to be international arms dealing. The United States through its Drug Enforcement Administration became focused on how to accomplish that objective.  The United States law enforcement was essentially stymied in their ability to charge Mr. Vigliakis with any criminal violations, since he did not do business in the United States, or act within the purview of United States law.

Accordingly, they created a sting operation to ensnare Viglakis so they could gain entrance to their designated target. This type of operation was similar to the ones that the United States Drug Enforcement Agency (hereinafter "DEA") had employed in other cases which resulted in prosecutions in the Southern District of New York (U.S. v. AlKassar, 582 F. Supp.2d 488 (S.D.N.Y. 2008) and U.S. v. Umeh, et. al., 201 1 WL 9397 (S.D.N.Y. 2011). The premise of this operation was that paid government operatives would act in fictitious roles as members of the FARC, a "designated foreign terrorist organization," operating in Colombia. It is alleged that the FARC is involved in counter measures against the Colombian government's cocaine fumigation efforts, and is dedicated to the violent overthrow of that government. Furthermore, it is alleged that since the United States has "contributed significantly" to Colombian fumigation efforts, the FARC leadership has ordered FARC members to kidnap and murder United States citizens in furtherance of their stated objectives.

It is alleged in the indictment that from at least November 2011, until August 7, 2012, Mr. Viglakis had meetings and phone conversations with a Confidential Source (CS) working in

4

conjunction with the Drug Enforcement Administration in an effort to negotiate a weapons transaction.  Over a period of months, through many emails and telephone calls, the CS engaged Mr. Vigalkis in an alleged proposed arms transaction.  While the DEA monitored CS's phone calls and emails during the operation, the main objective was to arrange a meeting with Mr. Viglakis.  The government alleges that CS said that Mr. Viglakis could provide various armaments to FARC.  It is alleged that on November 1, 2011, in Madrid, Spain; December 6, 2011, in Panama City, Panama, and February 14, 2012, in Athens, Greece, Mr. Viglakis participated in consensually recorded meetings with CS, at which Mr. Viglakis gave CS a handwritten list of the types of weapons the he could provide, including AK-47 assault rifles, sniper rifles, semi-automatic handguns, hand grenades, RPG launchers, and Russian-made SAMs, and that Mr. Viglakis told CS that he would be willing to receive payment for weapons in a combination of cash and cocaine.  The weapons were allegedly for FARC to fight the Colombian and American governments and to shoot down American aircraft.

The government alleges that Mr. Viglakis told CS in various other meetings that he could provide three RPG launchers to be delivered in Greece.  Further, the government alleges that on June 20, 2012, Mr. Viglakis told CS that he desired to purchase cocaine from CS.

On or about July 18, 2012, Mr. Viglakis participated in a consensually recorded meeting with CS while waiting for the launchers to be delivered to a DEA undercover agent in a nearby parking lot.  The undercover DEA agent then gave Mr. Viglakis a bag containing $55,000 in cash for the delivery of the RPG launchers.

However, during the alleged meetings Mr. Viglakis is never referred of having any enmity towards America or being eager of killing American pilots. While he did express general sympathies for their fight, each of Mr. Viglakis' comments might have been in response to

prompting by the undercover operatives in their aggressive orchestration of their roles as FARC members. While there was a general discussion of arms and aircrafts that Mr. Viglakis might be able to procure, and what the "buyers" might need, there was no meeting of the minds as to any exact quantity of arms, planes or parts that were going to be transacted, nor was any definitive price agreed upon for each of the items discussed.

## ARGUMENT

### I.    THE PROSECUTION OF DEFENDANT VIGLAKIS VIOLATES HIS RIGHT TO DUE PROCESS OF LAW

The prosecution of Mr. Viglakis, a Greek citizen who has never previously set foot in this country, for alleged crimes involving the proposed sale of weapons to a revolutionary organization in Colombia, South America, is an egregious and unprecedented violation of the due process of law. The government's actions in this case go far beyond any other reported case in expanding its jurisdiction beyond the borders of this country, entirely based on the actions of its paid undercover operatives.

The Fifth Amendment to the United States Constitution provides, in part: "[no] person shall . . . be deprived of life, liberty, or property, without due process of law." While courts have historically given the Executive Branch wide latitude in cases involving police over-reaching, see, e.g., United States v. LaPorta, 46 F.3d 152, 160 (2d. Cir. 1994); United States v. Mayer, 503 F.3d 740, 755 (9th Cir. 2007), cert. denied, 552 U.S. 1157 (2008), there are limits imposed by the Constitution, which the government in this case has grossly and uniquely exceeded. In Hampton v. United States, 425 U.S. 484, 485 (1976), the Supreme Court acknowledged that where "police over-involvement in a crime . . . reaches a demonstrable level of outrageousness," prosecution is barred under the Due Process clause of the Fifth Amendment. Courts have historically dismissed charged offenses on the basis of police over-involvement in undercover investigations, despite

the high bar set by the Supreme Court. See, e.g., United States v. Lard, 734 F.2d 1290, 1296-97

(8th Cir. 1984); United States v. Twigg, 588 F.2d 373,380 (31d Cir. 1978); United States v.

West, 51 1 F.2d 1083 (3d Cir. 1975); United States v. Gardener, 658 F.Supp. 1573, 1577

(W.D.Pa. 1987); United States v. Marchank, 777 F.Supp. 1507, 1524 (N.D. Ca. 1991); United

States v. Baltres- Santolino, 521 F.Supp. 744 (N.D.Ca1. 1981).

These cases have a common theme -where government authorities have gone beyond

merely providing a defendant with the opportunity to commit a crime, but have repeatedly

cajoled the defendant to violate the law, which he had no intention of committing (to wit, killing

Americans and affecting American interests), the case must be dismissed as a violation of due

process. See, e.g, Twigg, 588 F.2d at 381; West 511 F.2d at 1086. Problematic in these cases is

that:

> . . . the government takes on the unwholesome appearance
> of the manufacturer of the crime. The continuing vitality
> and integrity of our "government of laws" would be
> imperiled if we sanctioned the manufacturing of crimes by
> those responsible for upholding and enforcing the law.

Lard,734 F.2d at 1296.[1]

The government's overreaching in this case is profound and exceeds all other reported

cases, as a detailed examination of the indictment makes clear. As an initial matter, Ioannis

---

[1] The majority of circuits explicitly recognize the continued viability of the due process defense resulting from prosecutorial over-involvement rising to the level of "outrageousness" under the appropriate facts. See, United States v. Johnson, 565 F.2d 179, 182 (l St Cir. 1977), cert. denied, 434 US. 1075 (1978); United States v. Myers, 692 F.2d 823, 837 (2d Cir. 1982), cert. denied, 461 U.S. 961 (1983); United States v. Jannotti, 673 F.2d 578, 607 (3d Cir.)(en banc), denied, 475 U.S. 1106 (1982); United States v. Arteaga, 807 F.2d 424, 426 (5" Cir. 1986); United States v. Quintana, 508 F.2d 867, 878 (7" Cir. 1975); United States v. Jacobson, 916 F.2d 467, 469 (8" Cir. 1990)(en banc), rev'd on other mounds, 503 U.S. 540 (1992); United States v. Simpson, 813 F.2d 1462 (9" Cir.), cert. denied, 484 U.S. 898 (1987); United States v. Nichols, 877 F.2d 825, 827 (loih Cir. 1989); United States v. Capo, 693 F.2d 1330, 1336 (1 1" Cir.), denied, 460 U.S. 1092 (1983); United States v. Kelly, 707 F.2d 1460, 1468 (D.C. Cir.), denied,464 U.S. 908 (1983).

Viglakis had no apparent connection to the United States. The United States government sought his arrest in this case as an alleged international "arms trafficker and a narcotics trafficker." These charges absent a jurisdictional nexus to the United States. He was pursued by undercover operatives who used a sting operation for the express purpose of prosecuting him in the United States. There is no evidence that Ioannis Viglakis would have violated or did violate United States law, but for the undercover operatives' orchestration of a fictitious scenario.

### A. THE GOVERNMENT'S "MANUFACTURING" OF EXTRA-TERRITORIAL JURISDICTION OVER MR. VIGLAKIS VIOLATES DUE PROCESS OF LAW UNDER THE FIFTH AMENDMENT

In Counts One through Three, a finding of requisite extraterritorial jurisdiction depends essentially upon whether the defendant conspired to: attack Americans, affect United States' property interests, or provide weapons to the FARC knowing that the FARC planned to use them against the United States. Specifically, Count One alleges that Mr. Viglakis "Conspired to attack American forces in Colombia" and "possession and intent to distribute five kilograms or more of cocaine" in violation of Title 18 U.S.C. §§3238 and Title 21 U.S.C. 960(a).  Presumably, the government will argue that jurisdiction by this Court is appropriate, as the defendant allegedly, "was seeking weapons for use by the FARC to, among other things, attack American forces in Colombia." In Count Two it is alleged that the defendant "arranged for the delivery of three rocket-propelled grenade launchers and six rocket-propelled grenades to a law enforcement officer acting in an undercover capacity" in violation of  Title 18 U.S.C. §§ 2339(a)(d)(1), 3238, and 2.  In Count Three it is alleged that the defendant conspired and "arranged for the delivery of a destructive device, to wit, a rocket-propelled grenade launcher and a rocket-propelled grenade . . . in furtherance of, the attempt to commit narco-terrorism charged in Count One and the attempt to provide material support charged in Count Two" in violation of Title 18 U.S.C. 924(c)(1)(A),

(B)(ii), 3238, and 2.  The government will argue that jurisdiction exists because Viglakis attempted to supply weapons to the FARC to attack United States' interests. As shown below, there is no jurisdiction over Ioannis Viglakis in this case for any of the counts because it has been "manufactured" by the undercover operatives at the direction of United States law enforcement.

The concept of manufactured jurisdiction was set forth by the Second Circuit in the seminal case, United States v. Archer, 486 F.2d 670 (2d Cir. 1973). Archer involved federal prosecutors and agents, who devised a plan to root out alleged corruption in the New York State criminal justice system. Id. at 672. Their plan involved a false arrest and prosecution, and a bribe conveyed by a criminal attorney to an assistant district attorney to orchestrate a no true bill of the indictment by the grand jury. Id. at 673-74. Essentially, the prosecutors and agents in the case attempted to perform alchemy by turning a violation of state law, bribery, into a federal offense, a violation of the Travel Act, 18 U.S.C. §1952, by instigating telephone calls between the agents and defendants, which were used to satisfy the use of interstate or foreign telephone facilities necessary for jurisdictional purposes under the Travel Act. Id. at 672 and 683. Judge Friendly, writing for the Court, reversed the convictions and instructed that the indictment be dismissed, finding that federal jurisdiction had wrongfully been "manufactured" by the government, specifically that the "federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present." Id. at 682.

The Court's decision was based in part on its concern about an investigation stemming from "a grossly inflated conception of the role of the federal criminal law." Id. at 677. That concern, based on the federal government's exceeding its proper prosecutorial role by needlessly injecting itself in a matter of state concern, Id. at 672, is even greater in this case, where the federal government is attempting to essentially police the world, by prosecuting a non-citizen

who has no connection to the United States, for activities which are not American federal crimes, but for the undercover operatives' attempts to provide a sufficient nexus "to apply extraterritorially a federal criminal statute to a defendant." United States v. Yousef, 327 F.3d 56, 11 1 (2d Cir.), Cert. denied, 504 U.S. 933 (2003)(citing United States v. Davis, 905 F.2d 245,248-49 (9th Cir. 1990)(citation omitted)).

The instant indictment alleges jurisdiction based on several assertions that the defendant allegedly made to the undercover operatives when they declared that the FARC wanted to attack Americans or attack their weaponry. As the overt acts in the indictment allege, Ioannis Viglakis had been in discussions with undercover agents to sell weapons to the FARC for several months and that he would be willing to receive payment for weapons in a combination of cocaine and cash. Ioannis Viglakis and the undercover had contact in various countries in Europe and South American but not in the United States, and communicated by telephone and electronic mail. There is no allegation in the indictment, however, the desire to attack Americans, arguably with the weapons that Mr. Viglakis might supply, was rhetoric gratuitously interposed into the discussion by the undercover operatives.

The only reason these statements would have been gratuitously interposed into the conversation was to attempt to create the requisite jurisdictional nexus in the case. There was no reason why this would have been important in accomplishing an arms sale, other than to create jurisdiction. There is no other evidence alleged in the indictment that demonstrates that Ioannis Viglakis joined a conspiracy to sell weapons to FARC that would be used to harm Americans. The Second Circuit *per curiam* holding in Archer, 486 F.2d at 686-87, after a review on a petition for rehearing, is particularly applicable herein:

> . . . when the federal element in a prosecution under the Travel Act
> is finished solely by undercover agents, a stricter standard is

applicable than when the interstate or foreign activities are those of the defendants themselves and that was not met here. We adhere to that holding and leave the task of further line-drawing to the future.

### 1. Post-Archer Analysis

Since Archer, the Second Circuit has found federal jurisdiction only when the defendants took a voluntary action that implicated a federal element of the charged crime:

> [thus, when confronted with situations in which (i) [federal agents introduce] a federal element into a non-federal crime and (ii) the defendant then takes voluntary actions that implicate the federal element, this Court has consistently held that federal jurisdiction has not been improperly "manufactured" and that the statutory elements have been met.

United States v. Wallace, 85 F.3d 1063, 1066 (2d Cir. 1996). This standard is consistent with previous cases in this Circuit. See, LaPorta, 46 F.3d at 154 1994)(defendants committed jurisdictional act of burning a car); United States v. Lau Tung Lam, 714 F.2d 209, 211(2d Cir.), cert. denied, 464 U.S. 942 (1983)(defendant committed jurisdictional acts of acquiring United States visa and bringing drugs into the United States).

Similarly, in cases in other Circuits where the Courts have rejected manufactured jurisdiction arguments brought by defendants, there have been voluntary acts, as they were in Al Kassar (discussed more fully below), that have implicated the federal jurisdictional element. See, e.g, United States v. Al Cholan, 610 F.3d 945, 949 (6th Cir. 2010)(defendant committed jurisdictional act of voluntarily driving across state lines to rendezvous with a twelve-year old girl for the purpose of engaging in illicit sexual contact); United States v. Covington, 565 F.3d 1336, 1343-44 (11" Cir.), cert. denied, _____U.S. _____130 S. Ct. 564, 175 L. Ed. 2d 390 (2009)(defendant committed jurisdictional acts of hiring out-of-state hit- man, caused informant to travel inter-state, caused co-conspirator to send interstate money order, and used telephone to

call interstate to discuss details of entire crime); United States v. Mayer, 503 F.3d at 747, Cert.

denied, 552 U.S. 1157 (2008)(defendant committed jurisdictional act of making reservations to

travel to Mexico for sex with underage victim, sent payment for same, and expressed illicit

sexual preferences, traveled first part of trip to Mexico); United States v. Paktipatt, 168 F.3d 503,

1999 WL 90561 (9th Cir.) at *3, cert. denied, 537 U.S. 892 (2002)(defendant caused drugs to be

bound for the United States and co-conspirator present in United States); United States v. Clark,

62 F.3d 110, 11 1 (5th Cir. 1995), cert. denied, 5 16 U.S. 1058 (1996)(defendant committed

jurisdictional act of driving stolen vehicle across state lines).

Recent cases in the Second Circuit support this point. On several occasions in the last

twenty years, the United States government has brought non-American citizens from other

countries for trial in the United States, and the courts in this circuit and others have countenanced

such prosecutions, only because of the defendants' proactive involvement in those schemes. See,

e.g., United States v. Al Kassar, 582 F.Supp.2d 488 (S.D.N.Y. 2008)(conspiracy to kill United

States nationals in Colombia and conspiracy to provide anti-aircraft missiles to FARC in

Colombia); United States v. Bin Laden, 92 F.Supp.2d. 189 (S.D.N.Y. 2000)(bombings of U.S.

embassies in Africa); United States v. Ali Rezaq, 134 F.3d 1121 (D.C. Cir.), cert. denied, 525

U.S. 834 (1998)(aircraft piracy involving hijacking of Air Egypt flight and killing and seriously

injuring, inter alia, American passengers on it); United States v. Yunis, 924 F.2d 1086 (D.C. Cir.

199l)(hijacking Royal Jordanian airliner in Lebanon with American passengers). However, there

is an overriding singular reason the instant case is distinguishable from the above cited cases -

defendant Ioannis Viglakis did not take any active steps to participate in a conspiracy to kill

Americans.

In the case most facially similar, <u>United States v. Al Kassar</u>, 582 F.Supp.2d 488 (S.D.N.Y. 2008), the defendant was charged with five counts, the first four identical to those in this case. The charges stemmed from the defendants' conspiracy to provide millions of dollars of weapons to FARC which would be used to kill United States nationals in Colombia. Id. at 491. The defendants argued that the government improperly manufactured jurisdiction by misrepresenting the nature of the arms transaction, thus transforming an arguably lawful weapons transaction into a global conspiracy to kill Americans in Colombia. Id. at 493.

Applying the <u>Wallace</u> standard that manufactured jurisdiction does not exist when the defendants take voluntary actions that implicate the federal element, the court found that manufactured jurisdiction did not exist: "here, as already noted, the Indictment charges defendants with voluntarily conspiring to sell millions of dollars worth of weapons to the FARC, with the expectation that those weapons would be used to kill United States nationals, as well as taking active steps towards consummating that sale (including the receipt of laundered money from New York)." Id. at 494 (emphasis supplied).

As set forth in the indictment in <u>United States v. Al Kassar</u>, 07-CR-354 (S3) (JSR), the understanding that weapons the defendants would be providing to the FARC would be used to kill Americans was an integral part of the scheme that all participants affirmatively discussed and agreed to, starting four months before the defendants were arrested. A review of that indictment shows that on three different meetings and electronic correspondence, the defendants and co-conspirators discussed that the weapons, including surface-to-air missiles provided by the defendants would be used by the FARC to kill Americans, or the defendants would provide the FARC with soldiers to kill Americans and experts to train the FARC soldiers to use the weapons provided by the defendants against the Americans, and finally, on one occasion, one defendant

13

discussed how many Americans he had killed. In addition to these discussion, several active

steps are alleged in the indictment as overt acts in Count One, including: defendants receiving

original end user certificates from Nicaragua related to the weapons transaction (¶¶11(j,l));

defendants receiving large amounts money through wire transfers for down payments on

weapons or their participation in the conspiracy, some of which was sent from banks in America

to their accounts (¶¶11(r); (x); (y); (ii); and (nn)); and one of the defendants providing the

undercover operatives with a "specification sheet for a surface-to-air missile system that [the

defendant] agreed to obtain for the [undercover operatives]" (¶¶11(aa)).

These proactive steps, establishing jurisdiction, are: (1) a clear agreement, as evidenced

by discussions over several months, that the weapons and soldiers provided by the defendants to

the FARC, (2) one defendant's reference to personally killing Americans, (3) concrete actions by

the defendants including the receipt of end user certificates for the weapons, large wire transfers,

some of which were from American bank accounts, and the provision by one of the defendants to

the undercover agents of a specification sheet for surface-to-air missiles. Judge Rakoff

acknowledged this activity in the holding that manufactured jurisdiction did not exist in that

case:

> [h]ere . . . the Indictment charges defendants with
> voluntarily conspiring to sell millions of weapons to the
> FARC, with the expectation that those weapons would be
> used to kill United States nationals, as well as taking
> ***active steps*** towards consummating that sale (including
> the receipt of laundered monies from New York). Thus,
> as charged, defendants unquestionably took ***"voluntary
> actions that implicate the federal element[s]"*** of the
> charged crimes, which is enough for jurisdictional
> purposes.

Al Kassar, 582 F.Supp.2d at 494(citation omitted)(emphasis supplied).

14

The Viglakis indictment, however, is devoid of any allegations that he took affirmative steps to join a conspiracy that would provide weapons to the FARC that would be used to kill Americans. At most, Viglakis participated in a discussion about selling weapons to the FARC, which never culminated in a definitive understanding between the parties as to any terms, and lacked the "active steps" necessary to provide the requisite jurisdictional basis.

The gratuitous statements made by the undercover do not provide the necessary jurisdictional nexus. Unlike in Al Kassar, Viglakis did not receive end user certificates for weapon sales, he did not provide the undercover operatives with weapon specifications, nor did he take any active steps to participate in the "conspiracy." Here, the proffered jurisdictional nexus was contrived by the agents minutes before the defendant was arrested for his involvement in a conspiracy that allegedly lasted a period of nine months. For this reason, the indictment should be dismissed.

## II.   COUNTS TWO AND THREE MUST BE DISMISSED BECAUSETHE STATUTE DOES NOT ALLOW FOR EXTRATERRITORIAL JURIDISCTION

In Count Two, "Attempt to Provide Material Support to a Foreign Terrorist Organization," the indictment alleges violation of Title 18 U.S.C. §§ 2339(a)(d)(1), 3238, and 2, where the government alleges that Viglakis "arranged for the delivery of three rocket-propelled grenade launchers and six rocket-propelled grenades to a law enforcement officer acting in an undercover capacity," and Count Three "Possession of a Firearm, in violation of  18 USC § 924(c).

Defendant Viglakis maintains that there is a presumption against extraterritorial application of United States laws.  This presumption operates as a basis for the dismissal of Counts Two and Three.  ____ US ____ (2013), Kiobel v. Royal Dutch Petroleum Co., 133 S.Ct. 1659 (2013), Morrison v. National Australia Bank Ltd, 561 US _____, 130 S.Ct. 2869 (2011).

In particular, there is no indication that possession of a firearm, 18 USC §924 (c) was meant to apply in a extraterritorial context as is here allege by the government .

While it is indisputable that Congress has the power to enforce its laws beyond the territorial boundaries of the United States, see, e.g., E.E.O.C. v. Arabian American Oil Co., 499 US. 244,249 (1991); United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003), cert. denied, 540 U.S. 933 (2003); United States v. Kim, 246 F.3d 186, 188-89 (2d Cir. 2001), if it is intends to provide that power, it must clearly do so, see, Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 440 (1989). Generally, however, Congress passes legislation with domestic concerns in Mind. Smith v. United States, 507 U.S. 201, 204 n.5 (1993). The corollary of this principle is that ". . . legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." Foley Brothers v. Filardo, 336 U.S. 281, 285 (1949); see, Small v. United States, 544 U.S. 385, 388-89 (2005); United States v. Flores, 289 U.S. 137, 155 (1933). To put it another way, "Congress's awareness of the need to make a clear statement that a statute applies overseas is amply demonstrated by the numerous occasions on which it has expressly legislated the extraterritorial application of a statute." E.E.O.C. v. Arabian American Oil Co., 499 U.S. at 258.

Further support for the proposition that Congress did not intend to provide for extraterritorial jurisdiction is provided by examination of several other statutes set forth in Chapter 51-Homicide of United States Code Title 18. See, United States v. Jackson, 759 F.2d 343, 344 (4th Cir.), cert. denied, 474 U.S. 924 (1985)(to ascertain the purpose of a statute the Court can look, *inter alia*, to related statutes). Cf. Sale v. Haitian Centers Council. Inc., 509 U.S. 169, 171-73 (1993)(analysis of other parts of Act undertaken to determine Congressional intent).

An exception applied against extraterritorial jurisdiction to certain crimes was set forth in United States v. Bowman, 260 US, 94, 97-98 (1922).

> [t]he necessary locus, when not specifically defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds, which affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard.

The Court, however, followed up the exception, noting:

> [b]ut the same rule of interpretation should not be applied to Criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents."

Id.

Bowman refers, however, to a "class" of statutes "enacted because of the right of the government to defend itself," id., for which this presumption against extraterritoriality does not apply. The original "class" of criminal statutes in "Chapter 51-Homicide," are all "crimes against private individuals" which, under Bowman, are not subject to extraterritorial jurisdiction.

Another case in this court, United States v. Bin Laden, 92 F.Supp.2d 189 (S.D.N.Y. 2000) involved jurisdictional objections to charges stemming from the prosecution for the United States Embassy bombings in Africa. The Court found that §1114 had extraterritorial jurisdiction, stating that the statute was "intended to protect vital interests" and "a significant number of

United States officers and employees perform their official duties in places outside the United States"." Id. at 202. See, also United States v. Benitez, 741 F.2d 1312 (11th Cir. 1984), cert. denied, 471 U.S. 1137 (1985) (applying §1114 to acts which occurred in Colombia).

The Second Circuit criticized the decision in Bin Laden in an unrelated case decided shortly thereafter which also raised the issue of extraterritorial jurisdiction. In United States v. Gatlin, 216 F.3d 207 (2d Cir. 2000), the Second Circuit examined whether the sexual abuse of a minor on a U.S. military base in Germany could be prosecuted in the United States. The statute at issue, 18 U.S.C. §2243(a), referred to the Special Maritime and Territorial Jurisdiction of the United States contained within 18 U.S.C. §7. In Bin Laden, the Court refused to apply the presumption against extraterritoriality because it viewed Section 7 as a jurisdictional provision rather than a criminal statute.  In analyzing this issue, the Second Circuit found, that "... to accept Judge Sand's view would seriously undermine the presumption against extraterritoriality ..."Gatlin, 216 F.3d at 212.   The Second Circuit ruled that the presumption against extraterritoriality required the dismissal of the indictment for the crimes which occurred in Germany. Id. at 211-12.

Similarly, the First Circuit has also upheld the presumption against extraterritoriality. In the recent case of Carnero v. Boston Scientific Corporation, 433 F.3d 1,2 (lst Cir. 2005), cert. denied, 548 U.S. 906 (2006), the Court examined whether a foreign national working for subsidiaries of an American company could sue those companies under the whistleblower protection provision contained in Title VIII, Section 806, of the Sarbanes-Oxley Act of 2002, 18 U.S.C. 15 l4(A) 2005. In examining the statute and finding no explicit grant of extraterritorial jurisdiction by Congress in, inter alia, the plain language of the statute or by comparison with

other statutes under the act, the Court ruled that jurisdiction of the statute was confined to the borders of the United States. Id. at 18.

There is an additional important constraint on Congress's power to authorize extraterritorial jurisdiction. As discussed in section I(A) above, supra, the Due Process Clause of the Fifth Amendment requires a sufficient nexus between the defendant, his extraterritorial criminal conduct, and the United States. The Second Circuit has followed the Ninth Circuit in adopting the constitutional requirement of a sufficient nexus: "[i]n order to apply extraterritorially a federal Criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair."' Yousef, 327 F.3d at 111 (citations omitted). See also United States v. Davis. 905 F.2d 245, 248-249 (9th Cir. 1990), cert, denied, 498 U.S. 1047 (1991). In Yousef, the Second Circuit found that a sufficient nexus existed between the United States and the extraterritorial acts committed by the defendant, specifically because he conspired to directly harm United States interests by conspiring to bomb United States-flag aircraft, Yousef, 327 F.3d at 80- 81, and attacking a Philippine Airlines flight as a "test-run" in furtherance of the conspiracy, id. at 112. A finding of an underlying jurisdictional nexus was even more significant in Bowman. The defendants who were apprehended in Bowman were all American citizens, and were accused of conspiring with another American to perpetuate a fraud against the American operator of the steamer, in which the United States had an ownership interest. Bowman, 260 US. at 95.

The nexus between the United States and Ioannis Viglakis, however, is effectively non-existent. As noted above, Viglakis had never been in the United States, he is not, according to the indictment, alleged to have transacted any business in the United States, nor is he alleged to have

communicated with anyone in the United States. Furthermore, he took no active steps in furtherance of the alleged conspiracy. The only alleged connection to the United States is Viglakis' response to a couple of comments by the undercover operatives, who purposely attempted to create federal jurisdiction. With such a limited or non-existent jurisdictional nexus, due process of law requires that the count be dismissed.

**III.   COUNT THREE MUST BE DISMISSED BECAUSE THE DEFENDANT'S ACTIVITY DOES NOT FALL WITHIN THE STATUTORY JURISDICTION OF 18 USC § 924(c)**

In Count Three it is alleged that the defendant attempted to possess a destructive device, to wit, a rocket-propelled grenade launcher and a rocket-propelled grenade . . . in furtherance of, the attempt to commit narco-terrorism charged in Count One and the attempt to provide material support charged in Count Two" in violation of Title 18 U.S.C. 924(c)(1)(A), (B)(ii), 3238, and 2. The plain language of this statute does not provide jurisdiction over a defendant, like Viglakis, who is charged with possession of a firearm in violation of the statute, since he has not conspired with someone accused of violating the substantive part of that statute. Defendant Viglakis' conduct did not (1) affect interstate or foreign commerce; (2) was not committed by a United States national; (3) was not attempted to be committed against a United States national while the national is outside the United States; (4) and is not committed against property that is owned or leased by the United States or any of its departments or agencies, whether the property is within or outside the United States.

Since it is not alleged that defendant Viglakis conspired with someone accused of violating the substantive offense of acquiring and using anti-aircraft missiles, this count must be dismissed, for lack of jurisdiction.

In this regard, the Supreme Court has repeatedly stated that courts must presume that a legislature knowingly crafts a statute to accurately reflect its intent, and that the language used in the statute reflects that intent, i.e., "the legislature says in a statute what it means and means what it says." Connecticut National Bank v. Germaine, 503 U.S. 249, 253-54 (1992). See also United States v. Kozeny, 541 F.3d 166, 171 (2d Cir. 2008). For this reason, as the statute clearly provides for jurisdiction over a conspirator only when the conspirator is accused of conspiring with someone who has substantively violated the statute, and Mr. Viglakis is not alleged to have conspired with someone who has substantively violated the statute, this count must be dismissed.

## IV.   DEFENDANT IOANNIS VIGLAKIS REQUESTS THAT THE GOVERNMENT BE DIRECTED TO GIVE NOTICE OF EVIDENCE IT SEEKS TO INTRODUCE AT TRIAL PRIOR TO RULE 404(b)

Effective December 1, 1991, Fed R. Evid. 404(b) was amended to provide for notice in advance of trial of the general nature of the evidence which the government may seek to introduce pursuant to the rule.  The amendment does not specify what constitutes "reasonable notice in advance of trial", but the commentary provides that the amendment is intended to reduce surprise and promote early resolution on the issue of admissibility.  "FED. R. EVID. 404(b) (SENATE COMMITTEE NOTES 1991 AMENDMENT).  The notes further indicate that the addition of the notice provision brings Rule 404(b) in line with other evidentiary rules requiring pre-trial disclosures.  The rules referred to are Rule 412 which requires written motion of intent to offer evidence under the rule "not later than 15 days" before trial is scheduled to commence; Rule 609 requiring written notice of intent to use evidence of a conviction greater than 10 years old sufficiently in advance to provide the opponent fair opportunity to contest its use; Rule 803 (24) and 804 (b) (5), the residual hearsay rules, requiring notice "sufficiently in

<u>advance</u>" of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it.

Thus, the notice provision contemplates sufficient advance notice to allow the defense to investigate and prepare to meet this evidence as well as to properly litigate its admissibility prior to trial.

It is respectfully requested that the government be ordered to disclose any other act evidence at least sixty days prior to trial so that Mr. Ioannis Viglakis will have adequate and fair opportunity to investigate and challenge the veracity and admissibility of such evidence.

**V.    THE GOVERNMENT MUST DISCLOSE MATERIAL BEARING UPON THE CREDIBILITY OF GOVERNMENT WITNESSES AS SOON AS IT BECOMES AVAILABLE AS SUCH INFORMATION IS EXCULPATORY IN NATURE AND FALLS DIRECTLY WITHIN THE RULE ESTABLISHED IN _BRADY V. MARYLAND_ AND ITS PROGENY.**

The rule promulgated by the Supreme Court in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) requires the prosecution to disclose to the defense evidence favorable to the accused and material to guilt or punishment.  <u>See also</u>, <u>Moore v. Illinois</u>, 408 U.S. 786 (1972).  The rule in <u>Brady</u> has repeatedly been interpreted by the courts as requiring the disclosure of impeachment material. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule. "<u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972), quoting N<u>apue v. Illinois</u>, 360 U.S. 264m 269 (1959).  Indeed, <u>Giglio</u> stands for the very proposition that exculpatory evidence includes material which may well alter the jury's judgment of the credibility of a crucial prosecution witness as well as that which goes to the heart of the defendant's guilt or innocence.  This is so because guilt or innocence may turn on the credibility a given witness alone.

The defendant Ioannis Viglakis urges that the government be directed to furnish the defense with all favorable information tending to impeach government witnesses, in particular, the various cooperating witnesses.  There is no question that the government's able counsel are aware of their continuing obligation under the constitution and cases.  However, defendant seeks production of impeachment now, when it can be utilized at a meaningful time and in a meaningful manner.

The Supreme Court has re-affirmed the significance of Brady/Giglio material as recently as April, 1995, Kyles v. Whitley, 115 S. Ct. 1555 (1995).  In Whitley, the court reversed a conviction based upon the failure to produce Brady/Giglio.  Significantly, the material would have furthered in the defense attack on the credibility of the witness government and its investigation.

It is crucial that the defense be advised of the result of the cooperation witnesses proffer sessions and statements to the government.  In addition, the government should be ordered now to provide the number and length of time of informant sessions with government personnel. Kyles, supra, at 1573.

In United States v. Bagley, 473 U.S. 667 (1985), the Supreme Court expressly ruled that the failure to disclose impeachment evidence is subject to the same standard as any other exculpatory evidence.

With these fundamental precepts in mind, it is respectfully requested that the Court compel the government to disclose impeachment material for its witnesses as soon as it becomes available.  The case law requires that impeachment material be provided to the defense in the same manner as any other exculpatory material and that is on a continuing basis.  United States v. Taylor, 707 F. Supp 696 (S.D.N.Y. 1989) ("The government is under a continuing duty to

provide a defendant, upon request, with information material wither to guilt or punishment, and the government's suppression of such information, even in good faith, violates due process. ...Information which might impeach a government witness and any exculpatory statement made by a government witness should be disclosed under Brady.")  (citations omitted); United States v. Gleason, 265 F. Supp. 880, 887 (S.D.N.Y. 1967) (due process requirements override the statutory provisions of 3500).  In light of the complexity of the instant indictment and the quantity of impeachment material expected, it is requested that Giglio material be produced thirty days prior to trial.

## BRADY/GIGLIO MATERIAL AND F.R.E. 806

It is expected and known that the government will produce numerous accomplice witnesses.  Indeed, this practice has become the norm in complex federal criminal litigations. This fact of life usually means that the government will heavily rely upon co-conspirator declarations under F.R.E. 801(d)(2).  Under F.R.E. 806, defendant Ioannis Viglakis will have the right to attack or support the credibility of the declarant by any evidence which would be admissible for those purposes if declarant had testified as a witness.  Mr. Viglakis respectfully requests that all material under Kyles, Brady, Giglio be produced as to that declarant prior to the offer of the statement.

If, as Rule 806, states, the credibility of the declarant of an 801 (d)(2) statement may be attacked or supported as if he had testified, then, the production of impeachment material known to the government will be critical to establish a defense to these charges.

## <u>RESERVATION OF MOTIONS</u>

The defendant Ioannis Viglakis requests leave to more for any further relief warranted by the resolution of the aforesaid motions or by discovery made or information provided in a Bill of Particulars or as the result of litigation concerning any pretrial motion.

## <u>CONCLUSION</u>

Defendant Ioannis Viglakis respectfully requests the Court to grant his pre-trial motions for the reasons set forth above.

Respectfully submitted,

_____/S/_____
Justin Levine, Esq.
191 E. 161st Street
Bronx, NY 10451
(718) 992-9600