UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

      – v. –                            :          S1 12 Cr. 585 (KBF)

IOANNIS VIGLAKIS,                 :
   a/k/a "Pablo,"
                                  :
          Defendant.
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

# SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

                                                PREET BHARARA
                                                United States Attorney for the
                                                Southern District of New York
                                                Attorney for the United States of America

AIMEE HECTOR
MICHAEL LOCKARD
CHRISTIAN EVERDELL
Assistant United States Attorneys
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

      – v. –                                    :        S1 12 Cr. 585 (KBF)

IOANNIS VIGLAKIS,                          :
    a/k/a "Pablo,"
                                                        :
             Defendant.
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of Ioannis Viglakis, which is scheduled for July 18, 2014, and in response to Viglakis's sentencing letter of May 4, 2014 ("Deft. Sent. Ltr."). The defendant offered to provide large quantities of lethal, military-grade weapons to a DEA confidential source, who purported to represent the Fuerzas Armadas Revolucionarias de Colombia (the "Revolutionary Armed Forces of Colombia" or "FARC"), a violent international terrorist group based in Colombia. He then arranged for the successful delivery of three rocket-propelled grenade launchers ("RPGs"), with six accompanying RPG grenades, to an undercover law enforcement agent in Athens, Greece, and later gave thousands of euros to the DEA confidential source as a partial payment to the FARC to transport a multi-kilogram shipment of cocaine to Spain on his behalf. In sum, the defendant attempted to provide assistance in the form of arms and cash to a dangerous terrorist organization that has committed violent acts directed at the United States and its citizens. This conduct is extremely serious and calls for Guidelines sentence of 15 years imprisonment.

1

## II. BACKGROUND

### A. Introduction

From November 2011 through August 2012, agents of the Drug Enforcement Administration ("DEA") conducted an undercover investigation targeting the illicit weapons trafficking and drug trafficking activity of the defendant, Ioannis Viglakis. As part of the undercover operation, the DEA used a confidential source ("CS-1") who posed as a representative of the FARC seeking to purchase weapons. Over the course of several months, CS-1 spoke on the phone and had several in-person meetings with Viglakis in Spain, Panama, and Greece, during which Viglakis offered to provide military-grade weapons—including assault rifles, sniper rifles, rocket-propelled grenade launchers ("RPGs"), and surface-to-air missiles ("SAMs")—for use by the FARC to fight American forces in Colombia. On July 18, 2012, Viglakis arranged for the delivery of three RPGs and six RPG grenades to a DEA undercover agent in Athens in exchange for $55,000 in cash. In August 2012, Viglakis met with CS-1 in Panama to discuss a shipment of 25 kilograms of cocaine that Viglakis had been told would be delivered to Spain on his behalf by the FARC. Viglakis was arrested in Panama on August 7, 2012, after he had inspected and marked 25 kilograms of cocaine and given €8,500 to CS-1 as partial payment to the FARC to cover the shipping costs of the cocaine.

### B. The Defendant's Criminal Conduct[1]

#### 1. Early Meetings in Madrid and Panama City

CS-1 first met with Viglakis, who went by the alias "Pablo," on November 1, 2011 in Madrid, Spain. At the meeting, Viglakis told CS-1 that he was in contact with a black market

---

[1] The details of the defendant's criminal conduct are culled from the evidence in the case, including the recorded meetings and telephone calls, as well as the defendant's post-arrest statements and statements made at his innocence proffer.

weapons trader who had access to weapons from different countries. Viglakis also gave CS-1 a handwritten list of weapons that he would be able to provide, which included, among other things, AK-47 assault rifles, sniper rifles, semi-automatic handguns, hand grenades, RPGs, and Igla and Strela SAMs. At this meeting, Viglakis also provided CS-1 an e-mail address that CS-1 could use to contact him in the future.

Viglakis next met with CS-1 on December 6, 2011, at a hotel restaurant in Panama City, Panama. At that meeting, Viglakis and CS-1 discussed the recent killing of a FARC leader and CS-1 advised Viglakis that the FARC needed weapons to fight the Colombian and the United States governments. CS-1 also advised Viglakis that he wanted to buy samples of weapons before placing a larger order, and expressed interest in different types of military grade weapons. Viglakis showed CS-1 photos on his digital camera of specifications for various types of weapons that he could provide, including AK-47s, sniper rifles, RPGs, and Russian-made Igla and Strela SAMs. Viglakis then removed the memory card from the camera and gave it to CS-1. Viglakis also offered to have one of CS-1's associates travel to a warehouse in Kazakhstan to view weapons for sale in connection with the proposed transaction. Viglakis further told CS-1 that he owned a large aircraft that could be used to deliver the weapons and that he could send a representative to train CS-1's organization on how to use the weapons. Viglakis and CS-1 also discussed payment for the weapons. Viglakis agreed to receive a portion of the payment in kilogram quantities of cocaine, which would be delivered to Spain, and the rest in cash.

2. **February 14, 2012 Meeting in Athens, Greece**

Viglakis met CS-1 again on February 14, 2012 in Athens, Greece. At that meeting, CS-1 reiterated that he wanted to obtain weapons for the FARC and asked to purchase a sample of three to four RPGs before conducting a larger deal. Viglakis responded that he could obtain the

RPGs in Serbia and deliver them there, but insisted that CS-1 not bring the weapons into Greece, because he did not want to "arm a terrorist group" in Greece. Viglakis also discussed the kinds of weapons that the FARC would need to shoot down American planes and helicopters. Viglakis recommended that CS-1 purchase "heat seekers" (i.e., SAMs), which he indicated were prohibited, but which he said he could obtain. Viglakis further stated,"[SAMs] are expensive but . . . they really do the job. There's no escape for the plane. . . . [T]he plane goes down. Finished." Viglakis also reiterated that he would accept up to 25% of his payment for the weapons in cocaine with the remainder in cash, and asked that the cocaine be delivered in Spain.

Following the February 14th meeting, Viglakis and CS-1 communicated by phone and e-mail regarding the sample RPGs. In a call on March 21, 2012, Viglakis told CS-1 that he had "three houses" available, in a coded reference to the three RPGs, for $14,000 each. When CS-1 proposed picking up the RPGs the following week in Athens, Viglakis indicated that the weapons were not in Greece, but in "in a nearby country," and that CS-1 would have to pay for the transportation to get them to Athens.

After several months in which Viglakis and CS-1 were not able to agree on price and quantity for the sample of RPGs, Viglakis e-mailed CS-1 on June 2, 2012, and advised CS-1 that he had three RPGs available for sale. Viglakis told CS-1 that one of his contacts was "going to leave them at the price of 14 thousand Euros per unit, including the transportation to the city you want. . . [b]ut you will need to tell me if you are in agreement because it will be for the 3 altogether." Following this exchange, Viglakis and CS-1 began discussing arrangements for CS-1 to pick up the RPGs in Athens and set up another meeting for June 20, 2012 in Athens.

4

### 3. June 20, 2012 Meeting in Athens, Greece

At the June 20, 2012 meeting, CS-1 advised Viglakis that he brought money for the RPG samples. Viglakis told CS-1 that the RPGs would arrive in Athens that day from a broker that Viglakis knew well, but that the delivery might not take place until the next day. Viglakis told CS-1 that only one of his contacts would make the delivery and that CS-1 should give the money directly to him (Viglakis) after the delivery. Viglakis later placed a call to a third party, had a conversation in Greek, and then told CS-1 that his contacts were "on their way" and that they would be able to hand over the RPGs the next day. Viglakis informed CS-1 that he would be receiving the "latest" model RPG, which contained two grenades per box.

At that same meeting, Viglakis and CS-1 also discussed the FARC and its objectives, including the organization's desire to purchase additional weapons. Viglakis also discussed acquiring drugs from CS-1. Viglakis told CS-1 that he wished to buy merchandise from CS-1 in Panama, and discussed the logistics of a possible transaction. Viglakis told CS-1 that he would provide the name of a shipping company that CS-1 could use to send cocaine hidden in shipping containers. CS-1 stated that he could ship the drugs to Spain. CS-1 and Viglakis also discussed the possibility of placing a mark on certain kilograms of cocaine in Panama for Viglakis, so that Viglakis could identify the drugs when they arrived in Spain.

The transfer of RPGs was briefly delayed because Viglakis advised CS-1 in phone calls on June 21 and June 22 that there had been a problem transporting the RPGs into Greece. On June 27, however, Viglakis sent an email to CS-1 informing CS-1 that "two friends are ALREADY CONFIRMED in my country," indicating that two of the three RPGs for CS-1 had arrived in Greece. CS-1 made arrangements to travel to Greece in order to purchase the RPGs from Viglakis on July 18, 2012.

5

### 4. Delivery of Three RPGs in Athens on July 18, 2012

On July 18, 2012, Viglakis and CS-1 met in a café while Viglakis arranged for an associate to deliver three RPGs and six RPG grenades to a DEA agent posing as an associate of CS-1 (the "UC") in a nearby parking lot. While Viglakis and CS-1 waited in the café for the RPGs to be delivered, they discussed their future drug transaction. Viglakis asked CS-1 if CS-1 could help him get kilograms of cocaine and transport them to Spain. CS-1 told Viglakis that he had cocaine available and could assist him. Viglakis agreed to provide CS-1 with money for the drugs on his next trip to Panama.

As Viglakis and CS-1 waited at the café, a taxi driver arrived at the hotel parking lot where CS-1 had instructed Viglakis to send his representative. The taxi driver dropped off several packages in the parking lot. The UC picked up the packages and inspected them. Inside were three RPG launchers, six cylinders used as part of the firing mechanism of the RPGs, and six live grenades. Shortly thereafter, the UC traveled to the café where Viglakis and CS-1 were meeting, carrying a plastic bag that contained $55,000 in cash. In Viglakis's presence, the UC stated that the bag contained $55,000 and gave the bag to Viglakis. CS-1 left the location shortly thereafter, followed by Viglakis.

### 5. Arrest in Panama on August 7, 2012

Following the delivery of the RPGs, Viglakis continued to communicate with CS-1 about the drug shipment and Viglakis's upcoming trip to Panama, as well as additional weapons deals. In a phone call on July 25, 2012, Viglakis told CS-1 that one of his contacts had hand grenades and potentially additional RPGs available. In a phone call two days later on July 27, 2012, Viglakis and CS-1 again discussed a possible deal for the hand grenades, but later turned their conversation to the proposed drug deal. CS-1 told Viglakis that the FARC would be in charge of

transporting 25 kilograms of cocaine to Europe for Viglakis, and that he would give Viglakis's money to the FARC as payment for the transportation.

Viglakis traveled to Panama City, Panama in August 2012 and met with CS-1 about the cocaine deal. In the morning of August 6, 2012, CS-1 and a Panamanian undercover officer playing an associate of CS-1 (the "Panamanian UC") met Viglakis in a restaurant in the lobby of his hotel. At that meeting, Viglakis asked CS-1 about possible delivery locations in Spain for his 25 kilograms of cocaine. CS-1 told Viglakis that the kilograms were in a repair shop, and that the people at the shop would leave so that Viglakis and CS-1 could inspect the cocaine privately. Viglakis also offered to provide CS-1 with 200 hand grenades that had been stolen from the military in Greece, and told CS-1 that he could obtain false end-user certificates for the larger weapons shipment to the FARC that the two had discussed in previous meetings.

After the meeting in the restaurant, Viglakis, CS-1, and the Panamanian UC got into a car and drove approximately one hour to the car repair shop where Viglakis inspected and marked with the letter "P" (for "Pablo") approximately 25 kilograms of cocaine that were hidden inside a vehicle trap. CS-1 and Viglakis then traveled back to Viglakis's hotel. During the trip, CS-1 and Viglakis again discussed the 200 hand grenades and the additional RPG launchers. Viglakis indicated that while he had the hand grenades readily available, he had to obtain the RPGs from a third party. At one point, Viglakis attempted to call his contact in Greece about the deal, but could not make contact with him. At the conclusion of this meeting, Viglakis gave CS-1 €8,500 as partial payment for the cocaine.

Viglakis met with CS-1 a second time at Viglakis's hotel in the evening on August 6, 2012, where they again discussed the hand grenade deal. CS-1 asked Viglakis if he had heard from his contact about the hand grenades. Viglakis responded that his contact was on the island

7

of Crete but would try to fly to Athens first thing the following morning. Viglakis assured CS-1 that the hand grenades were already in Athens, and that the deal could be completed quickly because they were in possession of the weapons. Later in the conversation, Viglakis told CS-1 that his contact "Niko" would arrive in Athens at 10:00 a.m., and that "Niko" would be able to contact the man with the grenades as soon as he landed. CS-1 asked Viglakis for a contact number so that CS-1's associate who would receive the grenades for CS-1 in Athens could contact "Niko." A little later in the meeting, Viglakis handed CS-1 a piece of paper with a phone number for "Niko." Viglakis and CS-1 agreed that they would transfer the hand grenades in the same place in Athens where the RPG launchers were delivered, and that Viglakis would use the same taxi driver.

Viglakis and CS-1 met again the next morning on August 7, 2012. Viglakis told CS-1 that he had called his contact continuously about the grenades, and that his contact had arrived on time, but that the man in Athens with the grenades had his phone turned off. Viglakis said that he sent his contact to the house of the person with the grenades, but he was not there, and that they were just waiting for him to return. Shortly thereafter, Viglakis made a phone call, after which he expressed his frustration to CS-1. Viglakis told CS-1 that "Niko" had told him that they had not found the owner of the grenades, but that they had someone at his house waiting for him, and that they were searching for him elsewhere. CS-1 and Viglakis agreed to wait for the man with the grenades to show up. After waiting for some time, Viglakis and CS-1 agreed to split up, and that each one would call the other if anything new happened. Viglakis was arrested shortly thereafter.

### 6. Post-Arrest Statements and Phone Calls

Following his arrest, Viglakis gave a Mirandized post-arrest statement to DEA agents. Among other things, Viglakis acknowledged that he met CS-1, that CS-1 informed him that he (CS-1) represented the FARC, that CS-1 asked him for a sample of weapons, and that CS-1 was seeking surface-to-air missiles. Viglakis also stated that many people in Greece can obtain weapons, and admitted that he, himself, had contacts in Albania and other countries that could provide weapons and that he had been looking to make money through his dealings with CS-1.

When asked how he acquired RPG launchers and grenades, Viglakis stated that he called a supplier he knew, and told the supplier to bring weapons to Greece. Viglakis stated that although he did not know the full name of the weapons supplier, he had known him for several years. Viglakis further stated that he gave the unidentified arms dealer most of the money for the transaction. In addition, Viglakis acknowledged viewing and marking cocaine on the previous day, as well as giving CS-1 €8,500. Viglakis acknowledged that he expected the cocaine would be delivered to Spain and from there he planned to have the cocaine delivered to Greece.

During his post-arrest meeting with agents, Viglakis also made several phone calls at the request of the DEA agents to attempt to arrange for the delivery of the 200 hand grenades to the DEA in Athens. Viglakis eventually reached his contact "Niko," but was told by "Niko" that he could not get in contact with the arms dealer in possession of the grenades.

### 7. Innocence Proffer Statements

On July 29, 2013, Viglakis elected to engage in an "innocence proffer" with the Government to attempt to convince the Government that he was innocent of the crimes charged in the Indictment. Prior to the start of the proffer, Viglakis was advised that he had no immunity for his statements and that his statements could be used against him in any future proceeding.

9

During the course of that proffer, Viglakis made several statements about how he obtained the RPGs that were delivered in Athens on July 18, 2012. Among other things, Viglakis stated that Nikos Kallergis, whom he called "Niko," was a good friend of his from Crete. Viglakis stated that he contacted "Niko" after CS-1 asked him to obtain RPGs. "Niko" contacted Viglakis approximately two weeks later and said that he had spoken to an Albanian who could help get the weapons. Viglakis then told CS-1 that he would be able to obtain the RPGs, but Viglakis and CS-1 could not come to an agreement on price.

After a period of a few months from approximately April to June 2012, when the weapons deal was dormant, Viglakis said he reconnected with CS-1 and the weapons deal came back to life. At that point, Viglakis again called "Niko," who said that somebody in Albania had three RPGs they would sell. Viglakis arranged for CS-1 to come to Athens in June 2012 to pick them up, but "Niko" told Viglakis that the owners of the weapons could not deliver them into Greece because their truck had broken down. Shortly after CS-1 left Greece, "Niko" called the Albanians, who told "Niko" that they had three RPGs in northern Greece. "Niko" informed Viglakis, who in turn told CS-1. Viglakis and CS-1 arranged to meet in Greece in July 2012 so that CS-1 could receive the RPGs. Viglakis said that "Niko" arranged for the RPGs to be placed in a taxi and driven to a hotel near the airport, where Viglakis was meeting with CS-1. After Viglakis was paid for the weapons, he met with "Niko" and gave him $2,000. Viglakis said that "Niko" used most of the remainder of the money to pay the Albanians. Viglakis also stated that "Niko" called Viglakis a few days later and told him that he had a contact with 200 hand grenades, which Viglakis then offered to CS-1. However, this deal never materialized.

### C. The Defendant's Guilty Plea

On December 10, 2013, Viglakis pleaded guilty to Count Two of Indictment S1 12 Cr. 585 (KBF) (the "Indictment"), pursuant to a plea agreement with the Government (the "Plea Agreement"). Count Two charges the defendant with attempting to provide material support to a foreign terrorist organization, from at least in or about November 2011, up to and including on or about August 7, 2012, in violation of Title 18, United States Code, Sections 2339B(a)(1), (d)(1), 3238, and 2.

Pursuant to the terms of the Plea Agreement, the parties stipulated to an advisory Guidelines offense level of 37, calculated as follows: (1) the base offense level is 26, pursuant to U.S.S.G. § 2M5.3(a); (2) a two-level increase is warranted, pursuant to U.S.S.G. § 2M5.3(b)(1), because the offense involved the provision of dangerous weapons; (3) a twelve-level increase is warranted, pursuant to U.S.S.G. § 3A1.4(a), because the offense is a felony that involved and was intended to promote a federal crime of terrorism; and (4) a three-level reduction for acceptance of responsibility is warranted, pursuant to U.S.S.G. § 3E1.1(b), because of the defendant's timely guilty plea. The defendant is in Criminal History Category VI, pursuant to U.S.S.G. § 3A1.4(a), because the offense is a felony that involved and was intended to promote a federal crime of terrorism. Based on this calculation, the parties agreed that the advisory Guidelines range for the defendants is 360 months to life imprisonment. However, because Count Two carries a maximum term of imprisonment of 15 years, the defendant's stipulated Guidelines range is 180 months' imprisonment. Accordingly, the Government agrees that the Guidelines calculation set forth in the Presentence Investigation Report ("PSR"), as described below, is correct.

**D.    The Presentence Investigation Report**

The Probation Office issued it final PSR on May 5, 2014. The Probation Office concurred with the parties' calculation of the defendant's offense level, resulting in an applicable Guidelines range of 180 months' imprisonment. (PSR ¶ 50). The Probation Office recommends Guidelines sentence of 180 months' imprisonment. (*See* PSR at 19).

### III. ARGUMENT

Viglakis willingly provided deadly RPG launchers and ammunition, and offered to provide large quantities of even more lethal military weaponry, to someone he believed was affiliated with the FARC, a violent international terrorist organization. He did so believing that the FARC would use the weapons to attack United States military forces in Colombia. Viglakis also provided several thousand euros in cash for the FARC to transport a multi-kilogram shipment of cocaine to Spain on his behalf. This conduct is extremely serious regardless of whether the defendant's motivation for engaging in these crimes was purely financial or otherwise. The punishment should reflect the seriousness of the offense, and deter both this defendant and others from engaging in such conduct. Accordingly, the Government respectfully submits that a Guidelines sentence of 15 years imprisonment is appropriate in this case.

**A.    Applicable Law**

The United States Sentencing Guidelines (the "Guidelines") still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines

range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 50 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are

advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 522 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

**B.    The Defendant's Arguments for Leniency Are Contradicted by the Record**

As an initial matter, several of arguments raised by Viglakis in support of a lenient sentence are flatly contradicted by the record. For example, Viglakis asserts that he had no weapons contacts himself and that he relied on instructions given to him by CS-1 and others to locate a weapons source for the RPGs in Albania. That account directly conflicts with Viglakis's own admissions in his post-arrest statements and at his innocence proffer. During his post-arrest statements, Viglakis stated that he had his own contacts in Albania and other countries that could provide weapons. Viglakis further stated that when CS-1 asked him to acquire RPGs, he contacted a supplier he knew and told the supplier to deliver the weapons in Greece.

Viglakis provided additional detail on this point in his innocence proffer. Viglakis stated that when he was asked to provide a sample of RPGs, he contacted his friend Nikos Kallergis, a/k/a "Niko," to help him obtain the weapons, and that "Niko" called him back a few weeks later having located a source for the weapons in Albania. According to Viglakis, "Niko" was his go-between with the Albanian weapons source. "Niko" also arranged for the RPGs to be placed in the taxi for delivery to CS-1, and delivered the payment for the weapons to the Albanian source

14

of supply after the RPGs had been picked-up. Viglakis also stated that "Niko" called him a few days after the delivery of the RPGs and told Viglakis that he had a contact with 200 hand grenades, which was the subject of additional negotiations with CS-1. Viglakis also made several phone calls to "Niko" after his arrest in an attempt to arrange for the delivery of the 200 hand grenades to the DEA in Athens, an effort that was ultimately unsuccessful.

This record, which is based almost entirely on Viglakis's own admissions, clearly establishes that Viglakis was not led by the nose to weapons by CS-1. To the contrary, Viglakis had his own long-standing contact, "Niko," whom he called to locate the RPGs, and "Niko" was successful in obtaining the weapons. Viglakis's account in his sentencing submission is nothing more than an obvious attempt to minimize his own involvement in obtaining the RPGs and his subsequent attempt to obtain 200 hand grenades. It is simply disingenuous for Viglakis to claim that he needed to be directed by others in order to locate the RPGs. Viglakis had the means to find the RPGs himself, and easily was able to obtain the requested weapons through his own weapons contacts.[2]

In addition, Viglakis contends that his motivation for engaging in the deal was not for financial gain or to obtain narcotics. This is contradicted by Viglakis's post-arrest statements, in which he stated that he had been looking to make money through his dealings with CS-1 and that he gave CS-1 €8,500 expecting that the 25 kilograms of cocaine would be delivered to Spain and then delivered to Greece. It would make no sense whatsoever for Viglakis to hand over €8,500 of his own money, which presumably he would never see again, unless he intended to go through

---

[2] Viglakis claims that in a recorded conversation that took place on February 21, 2012, CS-1 told Viglakis to look for the RPGs in Albania and that they would cost approximately $12,000 each. The Government is not aware of any recorded phone call on February 21, 2012 between Viglakis and CS-1. There was an e-mail from Viglakis to CS-1 on that date, in which Viglakis offered to take CS-1 to see "the hotel rooms in nearby Serbia," a reference to inspecting weapons in Serbia.

with the narcotics shipment. Moreover, if financial gain or narcotics were not the defendant's motivation, as he claims, he does not then offer any explanation for what *did* cause him to engage in this conduct. The correct explanation is the one that Viglakis provided when he was first arrested: that he was hoping to make money off of the deal. That explanation is amply supported by the record.

C.     **The Court Should Impose a Guidelines Sentence**

In light of the facts set forth above, the Government believes that a Guidelines sentence of 15 years' imprisonment is appropriate in this case. Pursuant to *Gall*, the sentencing analysis starts with the advisory Guidelines range. *See also* 18 U.S.C. § 3553(a)(4). The Guidelines range reflects the considered judgment of the Sentencing Commission, after examining "tens of thousands of sentences and work[ing] with the help of many others in the law enforcement community over a long period of time" in an effort to fulfill the same objectives set out in Section 3553(a). *Rita*, 551 U.S. at 349. The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice," and accordingly, the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.*

A Guidelines sentence is appropriate in light of the nature of the offense and to address the goals of punishment and deterrence. The criminal conduct in this case was indisputably serious. Over the course of several months, Viglakis met with CS-1 on numerous occasions, in locations across the globe, to negotiate a significant arms shipment to benefit a terrorist group that has committed acts of violence against United States citizens. Viglakis provided three functioning RPG launchers with live ammunition to a person he believed represented the FARC. Viglakis knew that the FARC intended to use these weapons to shoot down United States military aircraft in Colombia. Viglakis even offered advice on which weapons would be the

16

most effective in achieving their goals. Viglakis employed his own network of contacts to locate the RPGs and deliver them to Greece, and received payment for his services. Viglakis also traveled to Panama to negotiate a multi-kilogram shipment of cocaine to Spain, and provided €8,500 to pay the FARC for the transportation costs of the drugs. Under these circumstances, a Guidelines sentence is necessary and appropriate to provide adequate punishment for Viglakis's role in a serious crime involving international weapons and narcotics trafficking and assistance to terrorist groups.

A Guidelines sentence would also serve the goals of sentencing by providing for both specific and general deterrence. A Guidelines sentence would powerfully impress upon the defendant that the costs of engaging in this type of criminal activity, far outweigh the anticipated financial benefits. Perhaps equally important, a Guidelines sentence will send a message to other similarly situated individuals who might choose to profit by dealing with terrorists groups that the United States will not tolerate such conduct, and that severe penalties will follow.

The Court should not consider the fact that Viglakis was not motivated to commit this crime by an anti-American or anti-Western animus, but rather by financial incentives, as a mitigating factor. While he may not be politically or ideologically driven, and he may not be anti-American, he nonetheless arranged for the transportation of lethal RPGs across international borders and delivered them to someone whom he believed worked for the FARC. Viglakis's failure to weigh the consequences of his actions and his indifference to the beneficiaries of his criminal conduct should not result in a sentencing benefit.

In sum, Viglakis committed a serious crime and his conduct calls for a Guidelines sentence of 180 months' imprisonment. This sentence is sufficient but not greater than necessary to serve the goals of sentencing.

## IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines sentence of 180 months' imprisonment.

Dated:      New York, New York
            July 11, 2014

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney for the
                                    Southern District of New York
                                    Attorney for the United States of America


                            By:     /s/
                                    Aimee Hector
                                    Michael Lockard
                                    Christian Everdell
                                    Assistant United States Attorneys
                                    Tel.: (212) 637-2203/2193/2556

**Affirmation of Service**

CHRISTIAN R. EVERDELL, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury, that he is employed as an Assistant U.S. Attorney in the Southern District of New York, and that, on July 11, 2014, he caused copies of The Sentencing Memorandum of the United States of America to be served via electronic notification and email:

> Justin Levine, Esq.
> 859 Concourse Village West
> Bronx, NY 10451

/s/
CHRISTIAN R. EVERDELL
Assistant United States Attorney